IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| **DANIEL P. FLING**, | ) |
| Plaintiff, | ) ) ) |
| v. | ) C.A. No. 1:17cv1266 (LO/JFA) |
| **MEGAN J. BRENNAN**, **POSTMASTER GENERAL**, **et al.,** | ) ) ) |
| Defendants. | ) ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT POSTMASTER GENERAL'S
RULE 12(b)(6) MOTION TO DISMISS**

COMES NOW your Plaintiff, by counsel, and hereby submits the following Memorandum of Points and Authorities in Opposition to the Motion to Dismiss filed by MEGAN J. BRENNAN, POSTMASTER GENERAL (Dkt. #29).

Facts Alleged in the Complaint and Procedural Posture

The "Introduction and Summary" portion of the Postmaster General's Rule 12(b)(6) Dismissal Memorandum seems to contain the following factual allegations, without citation to the Amended , and which are not otherwise supported by the Amended Complaint, or written items relied upon in the Amended Complaint: (a) "Plaintiff did not inform NALC of the notice of removal until a month *after* the 14-day grievance deadline had already expired" [p. 2]; (b) "[h]e alleges neither that NALC somehow prevented him from filing his own timely grievance, nor that NALC had an obligation to independently discover Plaintiff's notice of removal [ p.2].; (c) [o]nce the mandatory filing period passed, there was nothing NALC could do to salvage Plaintiff's grievance, as the National Agreement states that all disputes are deemed waived unless grieved within 14 days [ p.2; sic]; (d) "[i]ndeed, after Plaintiff finally informed NALC about the termination, NALC agreed to file a grievance anyway --and it was rejected as untimely because

1

it had not been submitted within 14 days of the notice of removal."  All of these factual assertions should be completely disregarded by the Court.

A.  *NALC's Irrational or Grossly Deficient Actions are Alleged in the Amended Complaint*

Plaintiff was off-duty from the USPS, and acting in his private, personal capacity, when he encountered Defendant Heywood on January 10, 2017, around 5:50 p.m.  Amd'd Compl., ¶¶ 19-20.  Plaintiff's allegation in regard to what he told the Union Vice-President, Michael Ellis, at a Pre-Disciplinary Interview, can only be read as a standing request that the Union "do anything and everything possible to make sure that these allegations were addressed and refuted and grieved, through the agreement and otherwise, and would not adversely affect his employment..." Amd'd Compl., ¶ 25.

In regard to the March 29, 2017 termination letter, ¶ 26 of the Amended Complaint states that the letter said Fling was to be terminated, "no sooner than thirty days after the receipt [by whom, not stated] of that letter.   This is not a date certain.

¶ 27 says Plaintiff met with the author of the termination letter, Martin, a Supervisor, "a few days after receiving Notice of the proposed termination."  Amd'd Compl., ¶ 27.  If this action were treated as a grievance, there is no question it would have been timely under the CBA, as to grievance the *Notice*.  On that date, Plaintiff attempted to show Martin cell phone records showing he had been there on January 10th to visit Svetlana Caron and her family members, and was told by Martin:  "you just hold on to those; keep those with you at all times," which Plaintiff assumed meant that he should present the same to the Shop Steward or union officials, in connection with any further grievance proceedings, or to some other person, in order to show his innocence."  At this 12(b)(6) stage, this allegation could be read consistent with number of different factual scenarios, or inferences, or a combination thereof:  (1) that Plaintiff was

affirmatively misled, fooled, or duped, by Martin, into incorrectly assuming or thinking that a formal or informal grievance had already been initiated, and this was the reason Martin was refusing to look at his evidence at that point in time, telling Plaintiff not to lose them, or worse yet, that Martin was in fact obfuscating Fling's efforts to grieve the notice of termination; and/or (2) the plausible inference that both Plaintiff *and* Martin may have both been operating on the same incorrect assumption or factual understanding that a grievance had already been separately initiated or a meeting otherwise schedule, on Fling's behalf, by the Union; or (3) the more *implausible* inference that Fling's action of attempting to discuss the notice of removal with Martin "a few days" after Fling received it, was somehow an unwitting but cognizable (under the CBA) attempt on Plaintiff's part, to discuss and/or resolve the "grievance" of Fling, such as it was, at that time.  (3) seems to be the most unlikely inference, given the wording of ¶ 27, as Martin's described actions are not consistent with "discussing" the grievance with Fling, as by Fling's account, Martin refused to engage in any discussion, or look at Fling's cell phone record evidence, all inconsistent with the description of what is apparently supposed to happen at Informal Step A in the Grievance Procedure [Dkt. 30-1, 1 of 13; "During the meeting the parties are encouraged to jointly review all relevant documents to facilitate resolution of the dispute"; "In any such discussion the supervisor shall have the authority to resolve the grievance'].

     Regardless of whether this attempt at discussing the grievance and notice of termination by Fling was an Informal Step A Grievance, the Informal Step A provision of the CBA Grievance Procedure provides for a *cumulative* (not alternative to whatever Fling did or did not do on his own) right or protection for Fling, allowing the Union leave to initiate a grievance  on Fling's behalf [regardless of what attempts Fling did not did not make at doing so, and regardless of whether he made affirmative efforts to engage the union further], at "...Informal Step A within

14 days of the date the *Union* first became aware of (or reasonably should have become aware of) the facts giving rise to the grievance. In such case, the participation of the individual grievant is not required."

¶ 28 of the Complaint is further to be read consistent with the factual proposition or inference that the McLean Postmaster affirmatively inquired of the Shop Steward at McLean (the Union), on May 12, 2017, before Fling's employment was actually terminated, as to whether the Union had filed, or was intending to file, a grievance regarding the termination of Fling, *because none had been filed, or no such grievance had been received to date, by, or was known to, the Postmaster*. ¶ 28 further alleges that, during that conversation, it was communicated to the Shop Steward [of the Union, who inferentially knows more about grievances and the procedure, than Plaintiff] that Fling had been given a notice of removal, and what the alleged factual basis for that removal was. It is not alleged that Fling was aware of these communications between the USPS and the Shop Steward, on a contemporaneous basis with their occurrence. Given the allegations in the Amended Complaint, which are made upon information and belief, while this was not the first instance now known to Fling of the Union learning of any impending or other decision to terminate Fling's employment, based upon allegations previously made known to the Union, the Union V.P. was at the Pre-Disciplinary Interview. As of May 12, 2017, however, none of the Defendants can contend that the Union was unaware of the need for Fling to grieve the notice of removal, if not the later removal itself, immediately.

<u>Argument</u>

If, as the Postal and Union Defendants seemingly contend, all grievance rights, as to the discipline and termination, were gone by this point [they were not, the Union had 14 days from May 12, 2017 within which to do this], it would seem superfluous or meaningless for the

4

Postmaster to inquire of the Union Shop Steward as to whether a grievance had or would be filed, in respect of the termination, as according to those same Defendants, there were no grievance rights at all, by that point, in any event, and the termination or notice of termination was no longer grievable, in any event.  Such a reading of the allegations in the Amended Complaint is contrary to construing the factual inferences in favor of the Plaintiff, at this stage.  The Court should infer that the Postmaster, at least at that point, [correctly] saw a live right on the part of the Union, if not Fling, to file a grievance, as to both the notice of termination, as well as the termination, and given the wording of the termination letter attached by Defendants to their motions, the Postmaster wanted to know, as the filing of any such grievance would have had the immediate effect of forestalling any further action on his part towards immediately terminating  Fling's employment, pending further proceedings on the grievance.

      The CBA is written to provide this right on a cumulative basis, to the Union, precisely in order to "level the playing field" as between the Postal Service, a presumably sophisticated operation with lawyers and HR officials, and unwitting employees like Fling, who are charged with misconduct, and that particular redundancy is likely there to ensure that any attempts by the USPS at "working around" or leaving the Union, as exclusive bargaining representative, effectively "out of the loop," for employment discipline and communication purposes.  Any other interpretation of the CBA would effectively "reward" the Postmaster General for obfuscating the NALC's role and expertise, as exclusive bargaining representative, for Fling, as well as others, as well as render meaningless the language in Informal Step A, that "[t]he Union *also* may initiate a grievance at Informal Step A...."

      The Formal Step A provisions of the Grievance Procedure also do violence to the contention that Fling could or should have somehow done something more than he did, without

5

the assistance or representation of the Union, to file or lodge a grievance with the Postmaster as to the notice of the decision to remove him from employment, on his own.  While the Informal Step A level makes provision for an employee to be able to initiate an Informal Step A on his or her own, the <u>Formal Step A</u> procedures do not admit to that possibility.  In other words, the Formal Step A only occurs with the participation, and at the instance and behest of, a Union representative.  The Informal Step A provisions also admit to the possibility of an Informal Step A Grievance being initiated by the Union, on Fling's behalf, without Fling's particularized knowledge of the existence or contents of the same.

  The Amended Complaint goes on to allege that on his behalf, Plaintiff's girlfriend, Barsotti, made efforts to contact the regional Vice-President of the Union, between May 12, 2017 and May 25, 2017, finally speaking with him on May 25th, and Ellis then claimed to her that the Union was "unaware of the issuance of the letter of removal," [this despite the fact that the Shop Steward was told the same thing on May 12, see above], but also soliciting a copy of the termination letter from Barsotti, which she e-mailed to him the same day.  Amended Compl., ¶¶ 30-31.  Still within 14 days of May 12th, on May 25, 2017, on behalf of Fling, Barsotti also spoke with Tom Cleer, the regional NALC President, during which conversation Cleer seemed to at least acknowledge knowing about the termination, but also falsely asserted to Barsotti that Fling had *"chosen* not to file a grievance," and stated that he had just assumed that Fling had "given up, and was "doing something else."  This false explanation for doing nothing was either posed in bad faith, wholly irrational, or inconsistent with what Fling says he requested from Michael Ellis, the Union Vice-President, at the time of the Pre-Disciplinary Interview (PDI) back in February of 2017, "to do anything and everything possible to make sure that these allegations were addressed and refuted and grieved, through the agreement and otherwise, and would not

6

adversely affect his employment."  Amd'd Compl., ¶ 25.  *Still* within the fourteen days, Barsotti again spoke with Cleer, of the Union, on behalf of Fling, on May 26, 2017 *again* falsely contended that Fling did not want to file a grievance, in the face of a request coming from Fling, through Barsotti, to do precisely that.  The Amended Complaint goes on to allege further grossly deficient or downright irrational, or worse yet, bad faith, conduct on the part of Cleer, in purporting to set up an appointment on *May 30th* [clearly beyond 14 days from May 12, 2017, when the Postmaster had told the local Shop Steward about the notice of removal], to file a grievance, and at that time [perversely] "see if management accepts it as timely."  ¶¶ 34-35 of the Amended Complaint go on to allege that a grievance was prepared by Cleer on May 30, which grievance was rejected by the Postmaster due to the fact that it was filed more than 14 days from the *union* [not Fling, the Union] being notified of the decision to terminate Fling.  ¶ 36 goes on to state that, in the late grievance eventually filed, the Union further put in plainly incorrect and false dates it knew or should have known were plainly incorrect, as to the date it had learned of the termination of Fling, inconsistent with both the Shop Steward being told on May 12th, and inconsistent with Ellis receiving a copy of the actual termination letter, from Barsotti, on May 25th.  ¶ 37 of the Amended Complaint posits that the insertion of plainly false and incorrect date of being informed, into the grievance it eventually did file, was basically "set up to fail" as a result of the fact that the Union was privately ok with the termination of Plaintiff, because he was alleged to have been involved in male-on-female harassment or stalking.  ¶ 39 also alleges, and makes clear, that if the Union had a true inclination and intent to successfully prosecute a grievance on Fling's behalf, regarding the termination, it would have done so within 14 days of May 12, 2017, which it did not.   The Court cannot simply ignore this allegation.  ¶ 43 goes on to allege that the Union intentionally delayed filing *anything* on behalf of Fling, in bad faith, and

7

out of a desire to give Fling the false impression that efforts were being made on his behalf, but to disguise a true intent on the Union's part to "let the termination stand without meaningful, sustainable, challenge." ¶ 44 also alleges that the Union's actions not only were completely irrational, but also deliberately indifferent, as to Fling, and a successful grievance, "erroneously ascribing enhanced legitimacy to the accuser's allegations, because she was a female, and less credibility or legitimacy to Fling's account of events, because of his status as an accused male. Amd'd Compl., ¶ 44.

The assertion that "Plaintiff had a history of making unwanted romantic overtures to female customers on his routes" [appearing at the Postmaster General's Memorandum in the first ordinal paragraph on p. 5] is not alleged in the Amended Complaint, and does not appear in the Notice of Removal, and should be disregarded on a 12(b)(6) Motion.

If, as the Postmaster seems to contend, the right of Fling and/or the Union on Fling's behalf, to grieve the termination, expired or was waived by *both* Fling, and the Union on his behalf, on April 12, 2017, or 14 days from the earlier of the date *either* Fling *or* the Union learned of the removal (Postmaster General's Memorandum, p. 6], such an interpretation would render meaningless, and/or surplusage, those explicit provisions in the Informal Step A procedure, as tie the 14-day period to when the *Union* [as opposed to Fling] "first became aware of (or reasonably should have become aware of) the facts giving rise to the grievance. In such case, the participation of an individual grievant is not required." The Informal Step A part of the Grievance procedure clearly contemplates, if not makes provision for the fact that, the Union may not always find out about the basis for the removal, from the grievant him or herself. Given the fact that the Informal Step A procedure would have readily allowed the Union to file a grievance, or seek extension of the grievance periods, with no consultation or participation at all

8

by Fling, the Court should be doubly suspicious of a circumstance where, as has been alleged here, the Union built in *additional* delay of filing anything, in order to have a wholly unnecessary and/or meaningless meeting with Fling, and by building in that very same delay, condemned what was eventually filed, to denial, due to alleged untimeliness.  Contrary to the bald assertion of the Postmaster in the first ordinal paragraph of page 7 of her Memorandum, there is no allegation in the Amended Complaint, or statement in the CBA, that the Step B panel for the grievance which was *eventually* filed, "concluded that under the National Agreement's mandatory language, the deadline to file a grievance was April 12, 2017, and that any grievance filed thereafter was untimely."    ¶ 35 of the Amended Complaint in fact alleges the opposite: that the said grievance was denied as untimely, not having been filed within fourteen calendar days of *the union* being notified of the decision to terminate Plaintiff."  The Postmaster General's motion conveniently ignores this distinction.

      The Postmaster General's Memorandum [at p. 7] also seems to take a general allegation appearing in ¶ 42 of the Amended Complaint, regarding the USPS impermissibly taking into consideration, as to the termination decision as to Fling, a prior "incident in which Plaintiff had been implicated, and cleared of any wrongdoing," which was to have been purged from Fling's personnel record, as part of the basis for the termination, into some sort of  affirmative allegation about Fling having been implicated in "stealing yard signs."   Neither the Amended Complaint, nor the Notice of Removal, makes any type of mention of the Plaintiff being accused of "stealing yard signs," or allegedly being cleared of wrongdoing for allegedly doing that.

      The above-described summary of facts in the Amended Complaint is sufficient to make out a case of breach of the duty of fair representation by NALC, and that NALC's conduct was

9

either arbitrary, irrational, grossly deficient, discriminatory, or in bad faith, or worse yet, all of those things.

At page 11 of "Rule 12(b)(6)" Memorandum, the Postmaster General engages in another impermissible exercise in reverse-inference-drawing, if not downright unsupported factual argument or speculation, that "Plaintiff admits that he knew he should have told NALC about it [the notice of removal letter]," purportedly on the basis of Fling's allegation in ¶ 27 of the Amended Complaint, that being told by the Postmaster that he should just "hold on to those" [cell phone records], meant that "he should present the "*same*"[the cell phone records, right?] to the Shop Steward or union officials, in connection with any further grievance proceedings, or to some other person, in order to show his innocence."  Being told to retain cell phone records, or evidence, for later grievance proceedings, or to prove oneself innocent of accused wrongdoing, is not the same as being told to, or knowing, that he "should have told NALC" about the letter of removal, which does not contain any cell phone records, or reference to any cell phone records. Despite the explicit allegation in ¶ 28 of the Amended Complaint that the Shop Steward for NALC was informed of the removal, and its general alleged basis, on May 12, 2017, the Postmaster General similarly tries to impermissibly twist and convert Fling's allegation that a Union Official Ellis later *claimed* to Barsotti that the union had been unaware of the removal up to May 25th, as being an admission or allegation *on Fling's part* that this was in fact the case [that the Union had not learned of removal until May 25, 2017], which read together with ¶ 28, it plainly is not.  This is why allegation in an Amended Complaint are to be construed as a whole on a 12(b)(6) Motion, and not in seeming "silos" or otherwise, in isolation from, other allegations in the same pleading.  The Postmaster's subsequent efforts as "bootstrapping" this plainly improper and incomplete interpretation of the Complaint, into the proposition that NALC did

not, in fact, have knowledge of the removal, until May 25, 2018, is little more than a semantic effort in obfuscation, having little to do with what is actually alleged, in various paragraphs of the Amended Complaint.

The Postmaster General and NALC are trying to take advantage of the fact that the Plaintiff necessarily has more limited knowledge, at this early stage, than they do, as to who in the Union knew of the removal, and exactly when, where, and how. The simple fact, however, is that, given Plaintiff's allegations in the Amended Complaint filed, the earliest date upon which *he* has been able to allege, upon information and belief, that NALC, as a matter of fact, was aware of his removal and general alleged basis therefor, was, and is May 12, 2017, the same day as he was later notified to clean out his locker and leave, and that his employment with the USPS had ended altogether.

The Grievance procedure appended by the Postmaster General as Exhibit #1 to its Memorandum does not support the Postmaster General's arguments for dismissal.

Under the analysis set forth in, and the authorities discussed in, *Ryder v. Phillip Morris, Inc.*, 946 F.Supp. 422 (4th Cir. 1996), Fling's claims against the Union in this case only could have accrued, at the *earliest*, as of when Fling discovered that no grievance had been filed or pursued on his behalf, as he had previously requested, which date was and is no earlier than the date of his dismissal, which same date later became known to Fling to be the same date by which the Union was provably known to have been on notice of the removal letter and alleged basis therefor, both May 12, 2017. This despite the fact that, even as of that date, and for fourteen days thereafter, the Union still had a full opportunity to prosecute a grievance regarding the termination, arguably supporting the proposition that the grievance process had not completely broken down or evanesced, to his detriment, even by that point. Even if May 12, 2017 was

11

chosen as the date Fling should have known that the system had broken down with the Union, this case is still timely, having been initially filed within six months of May 12, 2017. If, as Fling argues, the date by which Fling knew or should have known that Union process had broken down to his detriment, was only *after* the fourteen-day period for the Union to file a grievance on his behalf, had passed, this case, having been filed on November 7, 2017, is so much the more timely.

It also should not be forgotten that the allegations in paragraph 27 of the Amended Complaint arguably support that proposition that when Fling attempted to resolve the whole issue of the notice of removal latter, with a supervisor, within days of receiving it, on an informal basis, he was brushed off and told to present the same evidence he was attempting to present to management, to the Union, in connection with a grievance proceeding which apparently did not, in reality, exist. In this type of situation, the doctrines of equitable tolling and equitable estoppel have a common origin; they are based primarily on the view that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing his claim on time. *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987). Equitable tolling occurs where defendant, by active deception, conceals a cause of action. *Id.* Equitable estoppel exists where the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline, even though plaintiff knows it exists. In *Lekas v. United Airlines, Inc.,* 282 F.3d 296 (4th Cir. 2002), the Fourth Circuit declined to apply equitable tolling to a claim that the plaintiff had waited to file his claim against the employer because someone from the union had told him that United was "seeking a clarification from the Board and that Lekas should wait until United had received a definitive ruling before filing suit." The facts of that case do not give rise to application of the doctrine of equitable tolling, according to the Fourth Circuit,

because there was no evidence or allegation that *United* (as opposed to the Union) had done anything to conceal a cause of action or cause Lekas to miss the filing deadline. *Lekas*, 282 F.3d at 301. The facts alleged in the Amended Complaint in **this** case are more analogous or comparable to a situation like *Dement v. Richmond, Fredericksburg & Potomac R.R.*, 845 F.2d 451, 461 (4th Cir. 1988), in which the limitations period was held tolled where appellants were "affirmatively asked" to refrain from suit and told that their problem would be solved without the need for a civil suit. *Accord, Contee Sand & Gravel Co. v. Reliance Ins. Co.*, 209 Va. 672, 166 S.E.2d 290 (1969 (insurance company equitably estopped from relying on one-year limitations period for suit on payment bond where its' insurance agent had previously incorrectly, but not intentionally, misrepresented to plaintiff that the only bond on the project was only a performance bond, and did not cover materialmen like plaintiff, which the actual bond, it turned out, did).

The Postmaster General improperly tries to claim that Fling "should have known" that NALC did not file a grievance on his behalf, as of April 13, 2017 because "he never alleges NALC reached out to him." The Postmaster General cites to no authority for the legal proposition that the <u>lack</u> or absence of an affirmative given factual allegation, in a complaint, somehow constitutes a Rule 12(b)(6) basis for dismissal. That particular assertion, found at p. 20 of the Postmaster General's Memorandum, is nothing but an invitation for the Court to engage in rank speculation and semantics, as a basis for dismissal, which effort the Court should not engage in.

WHEREFORE, your Plaintiff respectfully requests that this Honorable Court deny the Postmaster General's Rule 12(b)(6) Motion in its entirety, and were the Court inclined to grant

the same, in whole or in part, grant Plaintiff leave to filed such Amended Complaint as is appropriate to the facts of this case, procedural posture, and law and equity, may seem mete.

                                  Respectfully submitted,

                                  DANIEL P. FLING
                                By Counsel

   /s/ Christopher R. Rau
Christopher R. Rau (Va State Bar No. 34135)
Attorney for Plaintiff Daniel P. Fling
Law Offices of Christopher R. Rau
6711 Lee Highway, Suite 220
Arlington, VA 22205-1940
(703) 536-1660 – Telephone
CRRAU@AOL.COM – E-Mail

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th Day of March, 2018, I filed the foregoing Memorandum with the Clerk of Court, using the CM/ECF System, which will generate a Notice of Electronic Filing (NEF), and transmit the NEF, together with a copy hereof, to each of the following registered users:

R. Trent McCotter, Assistant U.S. Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
trent.mccotter@usdoj.gov
*Counsel for Defendant Megan J. Brennan,*
  *Postmaster General*

Peter D. DeChiara, Esq., *Adm Pro Hac*
Kate M. Swearengen, Esq., *Adm Pro Hac*
Cohen, Weiss and Simon, LLP
900 Third Avenue
New York, NY 10022-4869
pdechiara@cwsny.com
kswearengen@cwsny.com
*Pro Hac Vice Counsel for Defendant NALC*

Lucas R. Aubrey, Esq.
Sherman Dunn, P.C.
900 Seventh Street, N.W., Suite 1000
Washington, D.C. 20001
aubrey@shermandunn.com
*Local Counsel for Defendant NALC*

Donald E. Morris, Esq.
Law Offices of Anthony D. Dwyer
3957 Westerre Pkwy., Suite 320
Richmond, VA 23233
Donald.Morris@cna.com
*Local Counsel for Defendants Gates Hudson*
  *& Lillian Court*

| | |
|---|---|
| Anthony D. Dwyer, Esq.<br>Law Offices of Anthony D. Dwyer<br>1954 Greenspring Drive, Suite 435<br>Timoneum, MD  21093<br>Anthony.dwyer@cna.com<br>*Counsel for Defendants Gates Hudson*<br>  *& Lillian Court* | Edward L. Isler, Esq.<br>Micah E. Ticatch, Esq.<br>Isler Dare, P.C.<br>1945 Old Gallows Road, Suite 650<br>Vienna, VA  22182<br>eisler@islerdare.com<br>mticatch@islerdare.com<br>*Counsel for Defendant Alexandra Heywood* |

　　　　　　　　　　　　　　　　　　　　　/s/ Christopher R. Rau　　　　　　
　　　　　　　　　　　　　　　　Christopher R. Rau (VSB No. 34135)
　　　　　　　　　　　　　　　　Attorney for Plaintiff Daniel P. Fling
　　　　　　　　　　　　　　　　Law Offices of Christopher R. Rau
　　　　　　　　　　　　　　　　6711 Lee Highway, Suite 220
　　　　　　　　　　　　　　　　Arlington, VA  22205-1940
　　　　　　　　　　　　　　　　(703) 536-1660 – Telephone
　　　　　　　　　　　　　　　　CRRAU@AOL.COM – E-Mail